United States District Court
District Of Maine

| | |
|---|---|
| Danielle Beauchemin, <br><br>         Plaintiff, <br><br>       v. <br><br> Kennebec County Emergency Management Agency, Kennebec County, Maine; Scott Ferguson; Cynthia Ferguson; Christine Brawn; and Art True, <br><br>         Defendants. | No. |

## Complaint for Violation of Civil Rights and Demand for Jury Trial

Danielle Beauchemin complains against the Kennebec County Emergency Management Agency, Kennebec County, Maine (EMA or the County), as well as Scott Ferguson, Cynthia Ferguson, Christine Brawn, and Art True in their individual and official capacities, as follows:

### Summary of the Action

1.　Danielle Beauchemin worked for Kennebec County's Emergency Management Agency for less than one year. In that time, she learned that her direct supervisor criminally invaded her privacy and stalked her; she faced harassment and discrimination from multiple other supervisors; and,

1

after complaining about this discriminatory treatment, she had her reasonable accommodation for her disability unlawfully withdrawn. The discrimination Ms. Beauchemin faced at work grew so severe that she was forced to take unpaid medical leave. While Ms. Beauchemin was on that protected leave, Kennebec County fired her.

2.     In April 2023, a few months after Ms. Beauchemin joined EMA as an Emergency Management Specialist, she discovered that her supervisor and EMA's director, Art True, had accessed her locked office and password-protected computer without her permission outside of work hours, opened her personal Google Photos account, and viewed and downloaded dozens of nude photos and videos of her.

3.     It turned out that Mr. True had been stalking Ms. Beauchemin for some time. A police investigation revealed that he had hidden cameras and a flashlight in the ceiling above her office so that he could observe Ms. Beauchemin while she was working.

4.     When Ms. Beauchemin immediately reported this flagrant violation of her privacy by her supervisor to EMA administrators and Kennebec County 's Human Resources department, they responded by minimizing the situation: they told Ms. Beauchemin to merely avoid Mr. True at the office and pressured her not to go to the police because they were allegedly going to handle the issue internally.

5. When Ms. Beauchemin went to the police against Kennebec County's wishes, County employees immediately began retaliating against her, including by berating her for bringing the issue to law enforcement. This treatment continued even after Mr. True resigned from his position and admitted to illegally spying on Ms. Beauchemin and downloading the nude photos of her.

6. Over the next several months, high-level County administrators continued to discriminate and retaliate against Ms. Beauchemin.

7. First, administrators rescinded Ms. Beauchemin's previously granted reasonable accommodation to bring her certified service dog to work. Ms. Beauchemin requested that the accommodation be reinstated because she needed her service dog to assist with her disabilities, and she submitted the required medical paperwork and proof that her dog was a certified service animal. County administrators responded by belittling the need for service dogs, commenting that they did not understand how "pets" could help people with disabilities, and accusing Ms. Beauchemin of not adequately proving that she "needed" her service dog. The County only reinstated Ms. Beauchemin's reasonable accommodation after her lawyers contacted County administrators on her behalf.

8. Second, County administrators continuously made light of Mr. True's criminal stalking and invasion of Ms. Beauchemin's privacy and

belittled the traumatic effect it had on Ms. Beauchemin, first by discouraging Ms. Beauchemin from going to police and later by referring to Ms. Beauchemin having a "relationship" with Mr. True.

9.      Third, County administrators began to categorically strip Ms. Beauchemin of the job duties she was hired to perform. When Ms. Beauchemin questioned this unexplained change in her responsibilities, the new EMA director who replaced Mr. True threatened her job by stating that he would write her position out of the federal grant that funded her role.

10.      Fourth, County administrators stated in writing to County CPR instructors that Ms. Beauchemin was to blame for them not receiving payments they were owed by EMA, even though Ms. Beauchemin had submitted requests for them to be paid to EMA's finance department and repeatedly notified administrators that the instructors had not been paid on time.

11.      Fifth, administrators fabricated evidence that Ms. Beauchemin was failing to perform her job duties and submitted that false evidence in a financing audit.

12.      The work environment at the County became so hostile to Ms. Beauchemin that she had to take unpaid medical leave. While she was on leave, the County fired her by doing precisely what the EMA director had threatened—writing her out of a federal grant.

13.    In short, Ms. Beauchemin was subjected to a hostile work environment by Mr. True and by County administrators after Mr. True's resignation in retaliation for her reporting Mr. True's criminal conduct to the police. The County engaged in a campaign of discrimination, harassment, and retaliation against Ms. Beauchemin for standing up for her rights, culminating in her termination, all in clear violation of federal and state laws and the U.S. and Maine Constitutions.

## Parties

14.    Plaintiff Danielle Beauchemin is a citizen of the United States and is a resident of Falmouth, Cumberland County, Maine.

15.    Defendant Kennebec County, Maine is a public entity that employs about 180 individuals. The Emergency Management Agency is a public agency and division of Kennebec County. It works with towns and cities in Kennebec County to prevent, mitigate, respond to, and recover from disasters.

16.    Defendant Scott Ferguson is the Kennebec County Administrator and a resident of the State of Maine. Mr. Ferguson is being sued in his individual capacity as well as his official capacity.

17.    Defendant Cynthia Ferguson is the County's Finance Director. Mrs. Ferguson is also a resident of the State of Maine. Mrs. Ferguson is being

sued in her individual capacity as well as her official capacity.

18.    Defendant Christine Brawn is the County's Human Resources Director and a resident of the State of Maine. Ms. Brawn is being sued in her individual capacity as well as her official capacity.

19.    Defendant Art True is a former employee of the County and a resident of the State of Maine. Mr. True is being sued in his individual capacity as well as his official capacity.

## Jury Trial Demand

20.    Under Federal Rule of Civil Procedure 38, Ms. Beauchemin demands trial by jury on all issues triable by a jury.

## Jurisdiction and Venue

21.    This action arises under 42 U.S.C. § 1983; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (Title VII); Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; the Maine Civil Rights Act, 5 M.R.S. § 4682 (MCRA); the Maine Human Rights Act, 5 M.R.S. §§ 4551–4634 (MHRA); and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831–840 (MWPA).

22.    Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental).

23.    Venue is proper in the District of Maine under 28 U.S.C.

§ 1391(b)(2)(2) because a substantial part of the events giving rise to the claim occurred in Kennebec County, Maine.

## Facts

24.     Ms. Beauchemin is a woman with mental health disabilities, including diagnosed ADHD and anxiety. She has benefited from multiple fully certified service dogs since 2013 to help mitigate the effects of these disabilities.

25.     Ms. Beauchemin began her job as an Emergency Management Specialist and Education Coordinator for Kennebec County's Emergency Management Agency in January 2023.

26.     Ms. Beauchemin's position was funded by a federal grant available under the American Rescue Plan Act of 2021 (ARPA), P.L. 117-2. Her initial employment contract was for a three-year term based on the timeline for funding under ARPA. But the County told Ms. Beauchemin upon hiring her that, after her three-year term under ARPA ended, her position would be moved over to the County payroll. This assurance led Ms. Beauchemin to believe that, as long as she performed well, her job was secure through 2025 and beyond.

27.     Ms. Beauchemin's job responsibilities as an Emergency Management Specialist included coordinating, scheduling, and facilitating

county-provided CPR and EMT trainings, interfacing with CPR instructors and EMT specialists, and assisting town and city officials and first responders across Kennebec County with disaster relief.

28.    Ms. Beauchemin had two direct supervisors at EMA: Art True, the EMA Director; and Jason Decker, the EMA Deputy Director.

29.    Soon after Ms. Beauchemin started her job, she met with Mr. True to request permission for her service dog to accompany her to the office and on EMA "missions" throughout the county. Mr. True approved Ms. Beauchemin's request, and she brought her service dog to work with her without issue for the next eight months.

30.    From January to mid-April 2023, Ms. Beauchemin enjoyed her job, performed well, and got along with her colleagues. She successfully built connections with EMT and CPR trainees and specialists across the County and earned a reputation among her colleagues for her diligence and work ethic.

31.    Only four months after she joined EMA, management rewarded Ms. Beauchemin's excellent job performance with a $5,000 raise.

### Art True begins stalking Ms. Beauchemin and criminally invades her privacy.

32.    On Tuesday, April 18, 2023, Ms. Beauchemin arrived at work as usual. But when she logged on to her work computer, she discovered in her

browsing history that someone had logged into her computer the previous weekend, when she had not been using it.

33.     The discovery shocked Ms. Beauchemin, as it was not common practice for EMA staff to access each other's work devices, especially without the person's knowledge. Further, security was ostensibly taken seriously at the EMA. For example, EMA offices are locked when unoccupied and only accessible via a dual-factor authentication system that requires fingerprint recognition and a passcode for entry.

34.     After further inquiry, Ms. Beauchemin discovered that the person who had accessed her office and logged onto her work computer had then entered her private online Google Drive account, looked at her Google Photos, and downloaded over one hundred photos of her. Many of these were uncensored nude images of Ms. Beauchemin taken while she was filming the reality survivalist show *Naked and Afraid*.[1]

35.     Ms. Beauchemin knew Mr. True had to have been the person who criminally invaded her privacy and downloaded the nude photos because Mr. True and Ms. Beauchemin were the only two people who could pass the fingerprint recognition and passcode security to access Ms. Beauchemin's office and work computer when they were locked.

---

[1] Ms. Beauchemin's Google Photos account was linked to her old cell phone, which had thousands of images on it. At no point did Ms. Beauchemin ever upload, download, or in any way access nude or explicit photos on her work computer.

36.    Mr. True's flagrant invasion of Ms. Beauchemin's privacy and theft of her nude photos left her feeling traumatized, scared, and unsafe at work.

37.    Ms. Beauchemin immediately told her other direct supervisor, Deputy Director Decker, what had happened and that she believed Mr. True had committed the crime. This was the first of many whistleblower reports Ms. Beauchemin made to County management and administration.

38.    In response to her report, Mr. Decker told Ms. Beauchemin, "don't go to HR because that would be bad." Ms. Beauchemin knew that Mr. Decker and Mr. True were close personal friends, and it was clear Mr. Decker was trying to protect Mr. True.

39.    Later that day, Ms. Beauchemin decided to report what Mr. True had done to Human Resources, despite Mr. Decker's attempt to stop her from doing so.

40.    Ms. Beauchemin was distraught when she made her report to HR. Rather than support her or ask how she could help, the HR representative simply offered to pay Ms. Beauchemin for the rest of the day but told her that she had to return to work the next day or not be paid. The HR representative did not offer to open an investigation into Ms. Beauchemin's report. She instead suggested that when Ms. Beauchemin next saw Mr. True, she should just close her office door.

41.    The HR representative also told Ms. Beauchemin that she would need to "find [her] own solution" to her safety concerns.

42.    Feeling that she would not receive any meaningful support from management or HR, Ms. Beauchemin called the Augusta Police Department and gave a statement regarding the criminal invasion of her privacy.

43.    That same afternoon, Ms. Beauchemin received a call from Mr. True. When she answered, he said he was currently at her computer to figure out what had happened and claimed that it could have been accessed by "international hackers" or someone who broke in through her office window. Clearly, someone had told Mr. True about Ms. Beauchemin's report and he was now trying to defend himself with outlandish scenarios.

44.    Ms. Beauchemin immediately notified HR about Mr. True's call and shared that she was shocked and disappointed that he still had access to her office and computer after her report that he had so brazenly invaded her privacy.

45.    The next day, April 19, 2023, the County's HR Director, Christine Brawn, called Ms. Beauchemin. Instead of asking how Ms. Beauchemin was doing and assuring her that the County was investigating and responding to her report, Ms. Brawn said she was upset that Ms. Beauchemin had gone to the police behind HR's back. Ms. Brawn said that she wanted to handle the issue internally and did not want the police involved.

46.    Later that day, HR emailed all the EMA workers to announce that Mr. True had resigned.

47.    In the afternoon of April 20, 2023, Lieutenant Johnson from the Kennebec County Sheriff's Office told Ms. Beauchemin that, upon initiating an investigation into her report, his office had discovered that camera footage around her office building at the relevant times (when her work computer had been hacked into and the photos downloaded) had been deleted.

48.    Lt. Johnson requested approval from EMA to open an "Administrative Investigation" into the stalking and invasion of privacy. He later told Ms. Beauchemin that County Administrator Scott Ferguson did not want to approve the funding necessary for the Sheriff's Office to conduct a thorough investigation.

49.    Lt. Johnson later learned and reported to Ms. Beauchemin that two hidden spy cameras were delivered to her office building about a week before the incident. He also found strange items—including tools and a flashlight—in the ceiling above Ms. Beauchemin's office. It became clear that Mr. True had dedicated significant time and resources to stalking Ms. Beauchemin.

50.    Mr. True later confessed almost everything to the authorities: he admitted that he had stalked Ms. Beauchemin, went into her office and logged onto her computer over the weekend without her permission, and

viewed and downloaded nude photos of her. Mr. True denied that he deleted

the camera footage and claims another County employee likely did so, though

he did not identify anyone specific.

### County management and administration continue to discriminate and retaliate against Ms. Beauchemin.

51.     After Ms. Beauchemin's police report but before Mr. True

resigned, County Administrator Ferguson assured Mr. True that Ms.

Beauchemin was making a big deal out of nothing and told him that she

could not be trusted.

52.     After Mr. True resigned, Mr. Ferguson began making comments

to other County employees that Ms. Beauchemin was "never at work,"

implying that she was not fulfilling her job responsibilities. In reality,

whenever she was not at the office during work hours, Ms. Beauchemin was

completing off-site job responsibilities such as CPR trainings. Many of Ms.

Beauchemin's core job responsibilities involved off-site tasks.

53.     Mr. Ferguson also had the County's IT department install a

computer monitoring software called Microsoft Teams Viewer on Ms.

Beauchemin's computer. No other County employee had this program

installed on their computer, and Ms. Beauchemin was never told why she

was the only one being surveilled.

54.     Less than a month after Ms. Beauchemin filed her police report,

Mr. Ferguson instructed Ms. Beauchemin's remaining manager, Mr. Decker, to put a hold on her scheduling of CPR training courses, even though scheduling these courses was one of her core job responsibilities. Taking away this responsibility without explanation left Ms. Beauchemin confused and concerned that she would be fired. This greatly exacerbated her existing anxiety caused by the stalking and criminal invasion of her privacy and the County's hostility following her reporting that criminal activity.

55.    Mr. Ferguson also began assigning Ms. Beauchemin tasks outside her job duties that had unrealistic deadlines. For example, one morning he asked her to send him an inventory of all ARPA equipment purchases over $3,500. This was unusual because another County employee, Mackenzie, oversaw inventory. When Ms. Beauchemin asked for clarification about why this task was assigned to her instead of Mackenzie, Mr. Ferguson responded by belittling her and saying, "[you] don't understand plain English or how to make an inventory sheet."

56.    In June 2023, John Brenenstuhl started as the new EMA Director, replacing Mr. True.

57.    On July 5, 2023, the County Finance Director (and County Administrator Ferguson's wife), Cynthia Ferguson, invited Mr. Brenenstuhl and two of Ms. Beauchemin's male colleagues to a meeting regarding an audit of the EMA's use of the ARPA grant funding that was being conducted

14

by an outside accounting and consulting firm, BerryDunn. Management did not invite Ms. Beauchemin to this meeting. Instead, one of her same-level colleagues invited her to join because the substance of the meeting was directly related to her position and job duties, since her position was funded by the ARPA grant being discussed. This colleague had no more reason to attend the meeting than Ms. Beauchemin did. Both Mr. and Mrs. Ferguson seemed surprised and nervous when Ms. Beauchemin attended the meeting.

58.     At the meeting, Mrs. Ferguson distributed BerryDunn's internal audit desk review, which contained a false statement that Ms. Beauchemin had not kept records of CPR trainee paperwork. It was clear to Ms. Beauchemin that County administrators had provided BerryDunn with this false information. Ms. Beauchemin repeatedly proved to Mrs. and Mr. Ferguson that the statement was demonstrably untrue by providing them with the records. But Mrs. and Mr. Ferguson ignored these attempts to correct the false information and allowed BerryDunn's flawed analysis to continue uncorrected.

59.     Throughout July 2023, Mrs. Ferguson began singling out Ms. Beauchemin in email threads that included her coworkers. She also assigned Ms. Beauchemin tasks that were outside her normal job responsibilities and experience level. When Ms. Beauchemin asked for clarification, Mrs. Ferguson would send replies meant to embarrass and belittle Ms.

15

Beauchemin in front of her coworkers. Mrs. Ferguson repeatedly ignored Ms.
Beauchemin's requests for an in-person meeting to clarify the new tasks
which she was being assigned.

60.     At one point, Mrs. Ferguson sent a demeaning email to Ms.
Beauchemin and more than 50 CPR instructors whom Ms. Beauchemin
managed accusing her of incompetence and saying, "Dani, Maybe you are not
familiar with the procedures at Kennebec County." This was a highly
degrading experience, particularly given that Ms. Beauchemin was
performing her job duties without issue. There was no reason that the CPR
instructors would need to be included on the email other than to embarrass
Ms. Beauchemin and publicly demean her reliability and competence.

61.     In mid-July, the new EMA Director, Mr. Brenenstuhl, began
taking away more of Ms. Beauchemin's usual job duties. For example, he
prevented her from attending EMA meetings that she had participated in
since she started working there. He also stopped letting Ms. Beauchemin
attend job-related trainings, telling her that if she wanted to attend
professional development trainings, she could do so off the clock, on her
personal, unpaid time.

62.     When Ms. Beauchemin asked Mr. Brenenstuhl why she was
being excluded from activities directly related to her job, he responded that
he had "to make a lot of people happy fast; You have to check with Scott and

16

HR; Your job duties are not entitled to you, I am your boss and I dictate what you do."

### The new EMA director responds to Mr. True's continued attempts to contact County employees with threats of violence, further exacerbating the trauma Ms. Beauchemin is enduring.

63.    On July 27, 2023, Mr. Brenenstuhl barged into Ms. Beauchemin's office and angrily told her that three other EMA staff members were outside the building talking to Mr. True, who was not supposed to visit the premises. He then told Ms. Beauchemin that he was going to get his gun from his truck.

64.    Despite hearing that her stalker was outside the building, Mr. Brenenstuhl's erratic behavior placed Ms. Beauchemin in the uncomfortable position of having to try to calm Mr. Brenenstuhl down by telling him that there was no need for violence. She then watched Mr. Brenenstuhl go to his truck and bring his gun, inside a black bag, into the office.

65.    Seeing her emotionally volatile manager bring a gun into her office building was terrifying.

66.    A week later, the HR Director, Ms. Brawn, responded to Ms. Beauchemin's concerns over the incident by telling her Mr. Brenenstuhl was within his rights to bring his gun to work.

67.    On August 1, 2023, Mr. Brenenstuhl confirmed to Ms. Beauchemin that he was canceling most of her remaining projects and that she was barred from conducting any tasks that were not "education-related,"

even though she was hired as an Emergency Management Specialist, which includes many responsibilities beyond education and training coordination. He also told Ms. Beauchemin that he would likely fire her by writing her out of the ARPA grant. Mr. Brenenstuhl told Ms. Beauchemin that he was being directed to do so by Mr. Ferguson and Ms. Brawn.

### EMA discriminates against Mr. Beauchemin based on her disability by rescinding a reasonable accommodation that she had previously been granted.

68.    On August 3, 2023, two days after he threatened to fire Ms. Beauchemin, Mr. Brenenstuhl emailed her claiming that there was a new pet policy and that only service dogs were allowed in the office.

69.    This sudden change in policy confused Ms. Beauchemin, so she spoke with County employees in other departments and found out that none had been notified of the "policy change."

70.    Ms. Beauchemin then told HR Director Brawn that Mr. True had approved her bringing her certified psychiatric service dog with her to the office months earlier, so this new policy should not impact her accommodation.

71.    On August 4, 2023, Ms. Brawn responded to Ms. Beauchemin's outreach by rescinding Ms. Beauchemin's accommodation, claiming that Mr. True's approval was invalid based on an uncited procedure. But Ms. Beauchemin followed the exact directions in the employee handbook in use at

18

the time for securing a reasonable accommodation for a disability.

72.    Ignoring Ms. Beauchemin's clarification that her dog was a "certified psychiatric service dog," Ms. Brawn also responded by saying that no accommodation could be made "[u]nless your dog is a **working** dog . . . psychiatric pets do not qualify" (emphasis in original). Ms. Brawn thus demeaned Ms. Beauchemin's disability and dismissed her certified service dog as just a "pet."

73.    Ms. Brawn demanded that Ms. Beauchemin resubmit her dog's certification along with a completed accommodation request form and a doctor's note "notifying us of your disability, and your need for such a service animal." Ms. Brawn also rescinded Ms. Beauchemin's permission to bring her service dog to work with her until a new accommodation request was approved.

74.    On August 8, 2023, Ms. Beauchemin provided all the newly required information and asked to continue bringing her service dog to work while the request was pending. Ms. Beauchemin emphasized that the hostility she was facing, combined with the trauma arising out of Mr. True's actions, were causing her significant emotional distress and that her service dog was "needed to provide critical mental assistance."

75.    Ms. Brawn forwarded Ms. Beauchemin's request to Mr. Ferguson. Mr. Ferguson responded, "Given Art's 'relationship' with Dani, would any

19

approval [of an accommodation request] have merit?" *See* Exhibit A, attached.

76.     Mr. Ferguson's use of "relationship" in quotes without acknowledging Mr. True's criminal conduct toward Ms. Beauchemin is extremely offensive. It implies either that Mr. Ferguson believed Ms. Beauchemin had some sort of sexual history with the man who was stalking her or that, as Mr. Ferguson initially told Mr. True, he did not take seriously what Mr. True had done to Ms. Beauchemin. Mr. Ferguson's dismissive tone in this email perfectly reflects his antipathy toward Ms. Beauchemin.

77.     Mr. Ferguson also dismissed Ms. Beauchemin's need for a service dog. Regarding Ms. Beauchemin's explanation that her service dog provides her with "critical mental assistance . . . especially with the office environment being so intimidating and hostile," Mr. Ferguson wrote, "I didn't realize a dog could provide critical mental assistance," thus admitting his ignorance of disability discrimination laws, which clearly explain the need for service animals as reasonable accommodations. *See* Ex. A.

78.     The next day, after Ms. Brawn's email exchange with Mr. Ferguson, Ms. Brawn told Ms. Beauchemin that her service dog would still not be allowed in the office while the renewed accommodation request was pending. Ms. Brawn scolded Ms. Beauchemin by saying, "your health care provider did not confirm your *need* for a service animal, I am not sure where

20

this will land" (emphasis in original) and "[p]ets are not professional or appropriate for the workplace, so we ask that employees not bring pets to work." She thus continued to belittle Ms. Beauchemin's disability and ignored Ms. Beauchemin's certification paperwork and her repeated explanation that her dog was a "service dog"—not merely a "pet."

79.    Ms. Brawn's email was wrong both legally, since a service dog is a reasonable accommodation under the ADA and MHRA, and factually, because Ms. Beauchemin's provider's note specified that she was receiving treatment "for a mental health related disability listed in the [DSM]. This mental health related disability impedes her ability to complete tasks at work and engage meaningfully with coworkers and clients when poorly controlled. I support their use of a service dog." The note went on to list the major life activities Ms. Beauchemin's disabilities impede and how her service dog mitigates those impediments, including "maintaining low anxiety."

80.    Later that day, Ms. Beauchemin asked for clarification about what additional information HR needed to approve her request. Ms. Brawn responded by quibbling that the provider's note was not sufficient because it only "supported" Ms. Beauchemin's use of a service dog and did not establish "that you need one."

81.    Over the next few days, Ms. Brawn and Ms. Beauchemin continued to exchange emails about Ms. Beauchemin's accommodation

request. Ms. Brawn repeatedly asked for information that Ms. Beauchemin had already provided or demanded more information than was necessary to approve an accommodation.[2]

82.    Growing increasingly frustrated with Ms. Brawn's delays and obfuscation, Ms. Beauchemin contacted an attorney to assess her legal options. On August 16, 2023, Ms. Beauchemin's attorney sent a letter to Ms. Brawn demanding that she comply with the ADA and MHRA and cease interfering with Ms. Beauchemin's right to a reasonable accommodation.

83.    That same day, Ms. Brawn emailed Ms. Beauchemin saying, "I don't need your diagnoses or what your full disability is exactly. We just need to know what the accommodation is for." Again, this ignored Ms. Beauchemin's provider's note, which clarified that Ms. Beauchemin's service dog mitigates the symptoms of her "mental health related disability."

84.    On August 21, 2023, Ms. Beauchemin's attorney was notified that her request for an accommodation was "provisionally" granted. Final approval was granted on August 30.

**In response to Ms. Beauchemin's additional whistleblower complaints, EMA continues to retaliate against her, including by threatening her job.**

---

[2] This was, by itself, a violation of the ADA and MRA. *See Bell v. O'Reilly Auto Enterprises, LLC*, 626 F. Supp. 3d 141, 177 n.7 (D. Me. 2022) ("An employer cannot ask for documentation when the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested." (quoting EEOC, *Enforcement Guidance*, 2002 WL 31994335, at *8) (citation modified)).

85.    During the month of August, Ms. Beauchemin made multiple internal whistleblower complaints to and about EMA.

86.    In early August, Ms. Beauchemin and her coworker Mackenzie reported to HR Director Brawn a conversation they had with Mr. Brenenstuhl in which he admitted to purposefully violating County policy by creating invoices for CPR instructors, which was normally the job of the finance department. When Ms. Beauchemin asked Mr. Brenenstuhl if he was directed to do this by Mrs. Ferguson (the Finance Director), he responded "she didn't have to. I'm the director."

87.    Ms. Brawn responded to Ms. Beauchemin and Mackenzie's report by email and cc'd Mr. Brenenstuhl on her response, exposing the text of Ms. Beauchemin and Mackenzie's HR complaint to the very person they had complained about. Ms. Beauchemin told Ms. Brawn that these actions worsened the already hostile and retaliatory environment she was facing.

88.    In the days following Ms. Brawn's disclosure to Mr. Brenenstuhl of Ms. Beauchemin's complaint against him, he predictably began to take retaliatory actions against Ms. Beauchemin. These actions included telling Ms. Beauchemin that he was cancelling a program that constituted the bulk of her workload and threatening to rewrite the grant scope to eliminate Ms. Beauchemin's position, which was not the first time he had threatened to

eliminate her position. Ms. Beauchemin reported this retaliatory conduct to

HR Director Brawn.

89.    On the multiple occasions when Mr. Brenenstuhl threatened her

job, Ms. Beauchemin asked about open EMA positions and vacancies in other

departments that she could fill. For example, in early August, there was a job

posting for an open geographic information services (GIS) position. The job

was part of EMA, and Ms. Beauchemin was qualified for the role. After she

inquired about the role, on August 3, Mr. Brenenstuhl emailed another

County employee and told him to "take down the GIS job listing," which he

did.

90.    On August 14, 2023, Lt. Johnson of the Kennebec County

Sheriff's Department met with Ms. Beauchemin and her colleague about the

mistreatment they had experienced since Ms. Beauchemin had filed her

police report about Art True in April. Ms. Beauchemin described the hostile

work environment and specified that Ms. Brawn, Mr. and Mrs. Ferguson, and

Mr. Brenenstuhl were the primary instigators. Lt. Johnson filed a report with

the Sheriff's Department, prompting the County to hire Attorney Kasia Park

of Drummond Woodsum to investigate Ms. Beauchemin's complaint.

91.    Ms. Beauchemin was interviewed as part of the Drummond

Woodsum investigation, but she was never notified of the results or provided

24

any report, despite submitting a statutory request for her personnel file, including a specific request for the investigation report.

92.     The County also twice refused to provide the Drummond Woodsum report to the Maine Human Rights Commission: first in response to the Commission's request for documents following Ms. Beauchemin filing her complaint, and then in response to the Commission investigator's request for documents. To this day, Ms. Beauchemin has not been notified of the results of Attorney Park's investigation into Ms. Beauchemin's hostile work environment complaint.

93.     On August 21, 2023, Ms. Brawn notified Ms. Beauchemin that Mr. Brenenstuhl was on administrative leave but did not give details about why or if he would return. The County never disclosed whether it terminated Mr. Brenenstuhl, but the director position was eventually filled by someone else.

94.     On August 24, 2023, Ms. Beauchemin and her colleague met with Mr. Ferguson and her remaining director supervisor, Deputy Director Decker, to discuss problems in the department. During the meeting, Mr. Ferguson rolled his eyes at Ms. Beauchemin and cut her off while she was trying to explain herself. Ms. Beauchemin told Mr. Ferguson that she was upset that Mrs. Ferguson had submitted false information regarding her job

and recordkeeping to BerryDunn in June. Mr. Ferguson responded by giving her permission to contact BerryDunn to clarify the false information.

95.    Ms. Beauchemin promptly emailed two BerryDunn representatives to set up a meeting and correct the information they were provided. On September 28, 2023, about a month after Ms. Beauchemin requested the meeting, BerryDunn representative Steven Whitney told her that he no longer felt it was necessary to meet with her. Ms. Beauchemin was never consulted or interviewed as part of BerryDunn's audit of the EMA.

### EMA falsely blames Ms. Beauchemin for late payments to County CPR instructors.

96.    Throughout July and August, Ms. Beauchemin was contacted by roughly 30 to 40 CPR instructors across the County who were contracted by the EMA to conduct training courses. They told her that the County had not paid them for facilitating these trainings since April. Ms. Beauchemin urged Mr. and Mrs. Ferguson to issue the overdue payments, but they did not do so. Eventually, the instructors submitted a complaint to the Maine Department of Labor.

97.    On August 30, Ms. Beauchemin emailed Mr. Ferguson explaining that CPR instructors were contacting her and telling her that HR and management were wrongly "shifting the blame of [the CPR instructors] not being paid to the staff in the EMA department."

98.     On August 31, Mr. Ferguson emailed Ms. Beauchemin demanding that she come to his office to sign documents. The documents were directed to the CPR instructors to explain the delay in payment.

99.     After careful review, Ms. Beauchemin noticed that the explanation falsely implicated her for the delayed payments, even though she had submitted all the necessary documents for each instructor to receive timely payment and had repeatedly reminded Mr. and Mrs. Ferguson about the delay in payments. The false explanation also confirmed what the CPR instructors had reported to Ms. Beauchemin: that the County administration was attempting to scapegoat EMA staff—particularly Ms. Beauchemin—for the administration's own failure to timely pay instructors.

100.    Ms. Beauchemin told Mr. Ferguson that she was not comfortable signing the documents as they were written. Mr. Ferguson grew frustrated and pressured Ms. Beauchemin to sign them. Ms. Beauchemin offered to leave with the documents so she could more thoroughly review them and suggest corrections before signing, but Mr. Ferguson refused to let her and said he just wanted them signed, that he would fix them later, and that the documents were not leaving his office.

101.    The newly hired EMA director, Sean Goodwin, who was in the room for the entire conversation, said he agreed that Ms. Beauchemin should be allowed to leave with the documents and even offered to bring the signed

27

documents back to Mr. Ferguson's office by the end of that day. But Mr.

Ferguson refused. Ms. Beauchemin felt extremely uncomfortable with the

level of pressure and coercion Mr. Ferguson was exerting on her to sign the

documents, which falsely blamed her. She made as many corrections as

possible while in the office and signed roughly half the documents for fear of

being disciplined or fired if she did not.

### The persistent hostile work environment at EMA exacerbates Ms. Beauchemin's mental health disabilities and eventually forces her to take unpaid medical leave.

102.   Throughout August and into September, Ms. Beauchemin sent

Mr. Ferguson requests for clarifications about assignments he had given her

that were outside her job duties. Mr. Ferguson frequently ignored these

questions and often withheld documents essential to the completion of the

assignments. Mr. Ferguson's actions demonstrated that he was setting Ms.

Beauchemin up to fail and making her job as miserable as possible in hopes

that she would quit.

103.   For example, after weeks of trying to set up meetings with Mr.

and Mrs. Ferguson, Mr. Ferguson claimed the reason they had not scheduled

a meeting was because Ms. Beauchemin had sent an email request rather

than a calendar invite. This sort of hostility and petty nitpicking had become

an everyday occurrence.

104.   Because of Mr. True's criminal invasion of Ms. Beauchemin's

privacy and the mounting hostile treatment that followed, Ms. Beauchemin was diagnosed with three new mental health conditions: chronic PTSD, major depression, and an adjustment disorder.

105.    In late August 2023, Ms. Beauchemin's mental health treatment provider recommended that she take a leave of absence from work to try to heal from the previous year. On September 22, 2023, Ms. Beauchemin submitted her request for unpaid leave as a reasonable accommodation, which EMA granted.

106.    Ms. Beauchemin's leave began on October 23, 2023. Her return-to-work date was scheduled for December 18, 2023. According to Ms. Brawn's email confirming Ms. Beauchemin's accommodation, the medical leave would be structured as:

> "Monday, October 23rd – November 7th you would be out using your accrued sick time and vacation time."

> "Wednesday, November 8 Leave of Absence would begin (unpaid) through December 15th."

107.    Ms. Brawn understood that Ms. Beauchemin was exhausting her entire paid leave bank to mentally recover from the hostile work environment she experienced and that her use of unpaid leave was an extension of that recovery period.

108.    Despite needing time away from work to recover, Ms.

Beauchemin could not escape the fear that the County was angling to terminate her employment. Ms. Beauchemin noticed by reviewing meeting minutes on her own time that, during Kennebec County Commission meetings in October and November 2023, BerryDunn and Mr. and Mrs. Ferguson were providing commissioners with false information about the allocation of ARPA funds and the success of the CPR and EMT training programs. Ms. Beauchemin was responsible for these programs and was hired to run them. Knowing that this false information had negative implications for her job, Ms. Beauchemin emailed the commissioners explicitly identifying the false information and providing corrections.

109.   Though at least one Commissioner acknowledged receipt of Ms. Beauchemin's communications, her concerns were ignored. She was not invited to speak at a Commission meeting, meet with any Commissioner, or meaningfully challenge the audit into her ARPA-funded role beyond what she had already submitted.

110.   On November 7, 2023, the Kennebec County Commissioners voted to redirect ARPA funds, thereby eliminating Ms. Beauchemin's position. The Commissioners made this decision based on false testimony submitted by Mr. and Mrs. Ferguson over the course of several months and on the results of the fundamentally flawed BerryDunn audit, which had relied on false information from County administrators.

### EMA fires Ms. Beauchemin while she is still on protected leave, and she continues to suffer because of how she was treated.

111.   On November 9, 2023, less than a month into Ms. Beauchemin's protected leave, HR Director Brawn sent her a letter notifying her that she was terminated.

112.   Ms. Beauchemin tried to persevere through her traumatic and anxiety-provoking time at the EMA because she was good at her job and loved the substance of what she was hired to do. Despite management's hostility, Ms. Beauchemin refused to be forced out of her job, and the County and EMA administrators ultimately fabricated information to justify terminating her.

113.   Being stalked, harassed, and discriminated and retaliated against has had a profound and lasting impact on Ms. Beauchemin's mental, emotional, and physical well-being. The anxiety and depression she experienced because of the hostile and retaliatory work environment continues to severely impact her ability to sleep, eat, or socialize. Ms. Beauchemin often cries herself to sleep and lost more than 30 pounds after being fired. She no longer gets the same sense of enjoyment from activities that she used to love, including spending time in nature and socializing with her friends. She is also fearful of using electronics and social media for fear of being spied on again.

114.   Ms. Beauchemin was discriminated against based on her disability and retaliated against for requesting a reasonable accommodation, in violation of the ADA and MHRA; she was subjected to a hostile work environment based on her sex and disability in violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, Title VII, the ADA, the MHRA, and the Maine Civil Rights Act; and she was retaliated against for reporting illegal conduct, in violation of the MWPA, the First and Fourteenth Amendments of the U.S. Constitution, and the MCRA.

## Administrative Exhaustion

115.   On February 14, 2024, Ms. Beauchemin filed a complaint of sex discrimination, disability discrimination, and retaliation against the County and the EMA with the MHRC and EEOC.

116.   On September 11, 2025, more than 180 days after filing her complaint with the MHRC, Ms. Beauchemin requested a right-to-sue letter from the MHRC. She received the notice of right to sue from the MHRC on October 1, 2025.

117.   Ms. Beauchemin also requested a right-to-sue letter from the EEOC on September 16, 2025—more than 180 days after filing her complaint with the EEOC—as she is entitled to under Title VII. After receiving no response, she again requested the letter on December 9, 2025. On December

17, 2025, the EEOC sent confirmation that Ms. Beauchemin's request has been forwarded to the U.S. Department of Justice for action on her request.

118.   Because Ms. Beauchemin has received her right-to-sue letter from the MHRC, and is entitled to and has requested her right-to-sue letter from the EEOC, Ms. Beauchemin has exhausted all administrative procedures required by the ADA, Title VII, the MHRA, and the MWPA.[3]

### Legal Claims for Unlawful Retaliation and Discrimination

### Count I against Defendants Scott Ferguson, Cynthia Ferguson, Christine Brawn, and Art True

### Sex Discrimination and Retaliation under 42 U.S.C. § 1983 and the Maine Civil Rights Act, 5 M.R.S. § 4682

119.   The allegations in the preceding paragraphs are realleged.

120.   Defendants Scott Ferguson, Cynthia Ferguson, Christine Brawn, and Art True, acting under color of state law, engaged in discriminatory

---

[3] *See Robertson v. Barber Foods, LLC,* No. 2:19-CV-00455-NT, 2020 WL 3104047, at *4 (D. Me. June 11, 2020) (denying the defendant's motion to dismiss based on a lack of administrative exhaustion when the plaintiff had received a right-to-sue letter from the MHRC, and had requested but not yet received a right-to-sue letter from the EEOC, because "the requirement of a right-to-sue letter is not jurisdictional" and, thus, is subject to waiver by the court); *Martinez-Rivera v. Commonwealth of Puerto Rico,* 812 F.3d 69, 78 (1st Cir. 2016) (explaining that the right-to-sue letter is "not a jurisdictional bar" and the requirement "can be waived by the parties or the court" (quoting *Pietras v. Bd. of Fire Comm'rs of Farmingville Fire Dist.,* 180 F.3d 468, 474 (2d Cir. 1999))). *See also Perdue v. Roy Stone Transfer Corp.,* 690 F.2d 1091, 1093 (4th Cir. 1982) ("[I]t is entitlement to a 'right to sue' notice, rather than its actual issuance or receipt, which is a prerequisite to the jurisdiction of the federal courts under s 2000e-5(f)(1)."); *Collins v. Kimberly-Clark Pennsylvania, LLC,* 247 F. Supp. 3d 571, 586 (E.D. Pa.) ("[C]ourts allow a plaintiff to file suit under Title VII even without the right-to-sue letter provided she can show that she is entitled to and has requested the letter."), *aff'd,* 708 F. App'x 48 (3d Cir. 2017).

practices—including harassment, creating a hostile work environment, and wrongful discharge—against Ms. Beauchemin because of her sex and in retaliation for protected activities, including reporting and opposing sexual harassment, sex discrimination, and illegal and unsafe conduct in violation of the First Amendment (incorporated through the Fourteenth Amendment to the U.S. Constitution), the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and Article I §§ 4, 6-A of the Maine Constitution.

121.   The individual County officials acted intentionally, maliciously, and with reckless disregard and indifference to Ms. Beauchemin's rights under the U.S. and Maine Constitutions.

122.   Ms. Beauchemin pursued her complaints against Mr. True both in her capacity as a public employee and as a private citizen, and her complaints related to matters of public concern, including criminal stalking by the head of a public agency.

123.   Defendants' retaliatory and discriminatory conduct caused Ms. Beauchemin, as a reasonable person, to suffer emotional distress.

124.   Ms. Beauchemin reserves her right to pursue all possible methods of proving her claims, including but not limited to unthinking stereotype, unconscious bias, unthinking bias, or implicit bias; circumstantial and direct evidence; pretext evidence; as well as causation based on one or

more retaliatory or unlawful but-for causal factors along with other non-retaliatory or lawful but-for factors; a single retaliatory or unlawful motive or cause; or mixed motives or but-for causes including at least one retaliatory or unlawful motive or motivating factor.

125.   Ms. Beauchemin's sex or protected activity "need not be the sole or primary cause of the employer's adverse action," and "[i]t doesn't matter if other factors besides the plaintiff's [protected statuses] contributed to the decision." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656-59 (2020). "Often, events have multiple but-for causes" and, thus, plaintiffs need only show that an adverse action was "based in part" on their protected status to prove a sufficient but-for factor of causation. *Id.* at 656, 659 (explaining meaning of statutory language "because of" in Title VII).[4]

126.   The Section 1983 and MCRA claims are brought against the individual Defendants in their individual capacities, except the claim for injunctive relief, which is brought against them in their official capacities.

127.   As a direct and proximate result of the violations of Ms.

---

[4] As explained in the Restatement (Third) of Torts, the but-for test of causation imposes no burden other than that the factor made *a* difference in the outcome: "An actor's tortious conduct **need only be a factual cause** of the other's harm," which is established if the "the harm would not have occurred absent" the impermissible factor. *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 26, cmt. c (second emphasis added). Moreover, the Restatement clarifies that under the but-for test, "[t]he existence of other causes of the harm does not affect whether specified tortious conduct was a necessary condition for the harm to occur." *Id.*

Beauchemin's constitutional rights by the Defendants, Ms. Beauchemin has suffered damages, including, but not limited to, lost pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and her life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

128.   Thus, Ms. Beauchemin requests relief against the individual Defendants as follows:

(a)    Enter declaratory relief that the individual Defendants violated Ms. Beauchemin's statutory and constitutional civil rights to be free from sexual harassment and unlawful retaliation;

(b)    Enter injunctive relief ordering the Defendants to reinstate Ms. Beauchemin and treat her in compliance with the rights guaranteed by the U.S. and Maine Constitutions, or, instead, award front pay for future lost wages and benefits;

(c)    Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(d)    Award punitive damages against the individual Defendants (Mr. True, Mr. Ferguson, Mrs. Ferguson, and Ms. Brawn), but not against the County or EMA, in amounts to be determined at a trial by the jury and prejudgment interest thereon;

36

(e)    Award Ms. Beauchemin back pay for lost wages and benefits and prejudgment interest;

(f)    Award Ms. Beauchemin full costs and reasonable attorney's fees, including full litigation expenses;

(g)    Award nominal damages if the jury awards no compensatory damages; and

(h)    Award such further relief as is deemed appropriate.

### Count II against Kennebec County Emergency Management Association, Kennebec County

### Discrimination and Retaliation in Violation of Title VII and the ADA, MHRA, and MWPA

129.    The allegations in the preceding paragraphs are realleged.

130.    Kennebec County and the EMA engaged in discriminatory and retaliatory practices—including harassment, creating a hostile work environment, rescinding a reasonable accommodation, and wrongful discharge—against Ms. Beauchemin because of her sex; her disability; and in retaliation for protected activities including reporting and opposing sexual harassment, sex discrimination, and disability discrimination, requesting a reasonable accommodation, and reporting illegal and unsafe working conditions; all in violation of Title VII, the ADA, the MHRA, and the MWPA.

131.    Ms. Beauchemin reserves her right to pursue all possible methods of proving her claims, including but not limited to unthinking

stereotype, unconscious bias, unthinking bias, or implicit bias; circumstantial and direct evidence; pretext evidence; as well as causation based on one or more retaliatory or unlawful but-for causal factors along with other non-retaliatory or lawful but-for factors; a single retaliatory or unlawful motive or cause; or mixed motives or but-for causes including at least one retaliatory or unlawful motive or motivating factor.

132.    Ms. Beauchemin's sex or protected activity "need not be the sole or primary cause of the employer's adverse action," and "[i]t doesn't matter if other factors besides the plaintiff's [protected statuses] contributed to the decision." *Bostock*, 590 U.S. at 656-59. "Often, events have multiple but-for causes" and, thus, plaintiffs need only show that an adverse action was "based in part" on their protected status to prove a sufficient but-for factor of causation. *Id.* at 656, 659. Similarly, to prove a claim under the MWPA, "the whistleblowing activities need not be the sole or primary factor motivating the termination" and "the existence of other reasonable grounds for her termination does not relieve the [employer] from liability." *Caruso v. Jackson Lab'y*, 2014 ME 101, ¶ 17, 98 A.3d 221, 227.[5]

133.    As a direct and proximate result of the violations of Ms. Beauchemin's statutory rights by the County and EMA, Ms. Beauchemin has

---

[5] *See also Rest. (3d) Torts: Liability for Physical and Emotional Harm* § 26, cmt. c.

suffered damages, including, but not limited to, lost pay and benefits, loss of self-confidence and self-respect, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of her job and her life, injury to reputation, injury to dignity and personal wellbeing, and other pecuniary and non-pecuniary losses.

134.   Thus, Ms. Beauchemin requests relief against Defendants as follows:

(a)    Enter declaratory relief that the County and EMA violated Ms. Beauchemin's statutory rights to be free from sex and disability discrimination and retaliation;

(b)    Enter injunctive relief ordering the County and EMA to reinstate Ms. Beauchemin and treat her in compliance with the rights guaranteed by Title VII, the ADA, the MHRA, and the MWPA, or, instead, award front pay for future lost wages and benefits;

(c)    Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(d)    Award Ms. Beauchemin back pay for lost wages and benefits and prejudgment interest;

(e)    Award Ms. Beauchemin full costs and reasonable attorney's fees, including full litigation expenses;

(f)    Award nominal damages if the jury awards no compensatory

damages; and

(g)    Award such further relief as is deemed appropriate.

        Respectfully submitted,

Date: December 30, 2025    /s/ Ryan M. Schmitz
        Ryan M. Schmitz
        Johnson & Webbert, LLP
        1 Bowdoin Mill Island, Ste 300
        Topsham, ME 04086
        (207) 623-5110
        rschmitz@work.law

        /s/ Kassandra S. Fotiadis
        Kassandra S. Fotiadis
        Johnson & Webbert, LLP
        1 Bowdoin Mill Island, Ste 300
        Topsham, ME 04086
        (207) 623-5110
        kfotiadis@work.law

        /s/ Braden A. Beard
        Braden A. Beard
        Johnson & Webbert, LLP
        1 Bowdoin Mill Island, Ste 300
        Topsham, ME 04086
        (207) 623-5110
        bbeard@work.law

        *Attorneys for Plaintiff*